**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ALEX EMRIC JONES,                    :
c/o Pattis & Smith                   :
383 Orange Street                    :
New Haven, CT 06511                  :
                                     :
      *Plaintiff,*     :        Dkt. No.:
                                     :
v.                                   :
                                     :
SELECT COMMITTEE TO                  :
INVESTIGATE THE JANUARY 6            :
ATTACK ON THE UNITED STATES          :
CAPITOL;                             :
                                     :        :
NANCY PELOSI, in her official        :
capacity as Speaker of the U.S.      :
House of Representatives;            :
                                     :
BENNIE G. THOMPSON, in his official  :
capacity as Chair of the Select      :
Committee To Investigate the January :
6th attack on the United States Capitol; :
                                     :
ELIZABETH L. CHENEY, in her official :
Capacity as a member of the U.S.     :
House of Representatives;            :
                                     :
ADAM B. SCHIFF, in his official      :
Capacity as a member of the U.S.     :
House of Representatives;            :
                                     :
JAMES B. RASKIN, in his official     :
Capacity as a member of the U.S.     :
House of Representatives;            :
                                     :
SUSAN E. LOFGREN, in her official    :
capacity as a member of the U.S.     :
House of Representatives;            :
                                     :
ELAINE G. LURIA, in her official     :
capacity as a member of the U.S.     :
House of Representatives;            :
                                     :

1

PETER B. AGUILAR, in his official :
capacity as a member of the U.S. :
House of Representatives; :

STEPHANIE MURPHY, in her official :
Capacity as a member of the U.S. :
House of Representatives; :
 :
ADAM D. KINZINGER, in his official :
capacity as a member of the U.S. :
House of Representatives; :
 :
    *Defendants*. : December 20, 2021

## **COMPLAINT**

1. This is an action to protect individual liberties and rights as old as the United States Constitution itself, rights that the United States Congress now seeks to suspend in coercive secret proceedings specifically designed to satiate a political witch hunt, bypass constitutional safeguards, and hijack the role of the Executive Branch while threatening criminal prosecution against anyone who dares to assert his rights and liberties against its demands. Alex Jones seeks declaratory and injunctive relief.

## **PARTIES**

2. The Plaintiff, Alex Jones, is a controversial American journalist, political commentator, activist, and businessman. He hosts a worldwide radio and television show – *The Alex Jones Show* – and operates a media company, Infowars.

3. The Defendant – the Select Committee to Investigate the January 6th Attack on the United States Capitol – is a congressional committee ostensibly organized and operating under cloak of the Rules of the United States House of Representatives.

4.     Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the United States House of Representatives and its current speaker. She is sued in her official capacity only.

5.     Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the United States House of Representatives and the Chairman of the Select Committee to Investigate the January 6th Attack on the United States Capitol. He is sued in his official capacity only.

6.     Defendant Elizabeth L. Cheney is purportedly a Republican member of the United States House of Representatives and a member of the Select Committee to Investigate the January 6th Attack on the United States Capitol. She is sued in her official capacity only.

7.     Defendant Adam B. Schiff is a Democrat member of the United States House of Representatives and a member of the Select Committee to Investigate the January 6th Attack on the United States Capitol. He is sued in his official capacity only.

8.     Defendant James B. Raskin is a Democrat member of the United States House of Representatives and a member of the Select Committee to Investigate the January 6th Attack on the United States Capitol. He is sued in his official capacity only.

9.     Defendant Susan E. Lofgren is a Democrat member of the United States House of Representatives and a member of the Select Committee to Investigate the January 6th Attack on the United States Capitol. She is sued in her official capacity only.

10.     Defendant Elaine G. Luria is a Democrat member of the United States House of Representatives and a member of the Select Committee to Investigate the January 6th Attack on the United States Capitol. She is sued in her official capacity only.

11.     Defendant Peter R. Aguilar is a Democrat member of the United States House of Representatives and a member of the Select Committee to Investigate the January 6th Attack on the United States Capitol. He is sued in his official capacity only.

12.     Defendant Stephanie Murphy is a Democrat member of the United States House of Representatives and a member of the Select Committee to Investigate the January 6th Attack on the United States Capitol. She is sued in her official capacity only.

13.     Defendant Adam D. Kinzinger is purportedly a Republican member of the United States House of Representatives and a member of the Select Committee to Investigate the January 6th Attack on the United States Capitol. He is sued in his official capacity only.

## JURISDICTION

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201 as well as the principles established in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Venue is proper under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### *Background.*

15.     On November 3, 2020, the United States held a general election, and Democrat Joseph R. Biden, Jr., was declared the winner of the presidential race.

16.     In the aftermath of Election Day, President Donald J. Trump, his campaign, and prominent national political commentators raised questions about electoral misconduct including voter fraud, claimed irregularities with voting machines, and alleged mishandling of mail-in ballots – questions all fairly prompted by the first mass mail-in voting presidential election.

17.     Under the requirements of the United States Constitution, both houses of the United States Congress scheduled themselves to convene in a joint session on January 6, 2021 to receive and certify the votes of the Electoral College.

18.     President Trump and his supporters protested that the election had been stolen, and various supporters of President Trump began to organize protests in Washington D.C. opposing the certification of the Electoral College votes and voicing displeasure with President Biden, the Democrat Party, its leadership, and their policy proposals.

19.     In a well-known episode on January 6, 2021, a large group of protestors in Washington, D.C. entered the United States Capitol, breached security, and disrupted the counting of the Electoral College votes until order was restored. The United States Department of Justice has arrested and charged more than 500 individuals in connection with the activities on January 6, 2021 including an employee of Plaintiff Jones' company – Owen Shroyer.

***Formation of The Select Committee.***

20.     In the aftermath of Congress' second failed attempt to impeach President Trump and after he left office, the House of Representatives explored mechanisms for investigating the January 6 protests.

21.     On June 30, 2021, the House approved H. Res. 503 – a resolution introduced by Speaker Pelosi – on a partisan vote of 222 yeas and 190 nays. Only two Republicans, Defendant Cheney and Defendant Kinzinger, voted in favor of it.

22.     H.R. 503 established the following purposes for the Committee:

a. "To investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement agencies in the National Capital Region and other instrumentalities of government, as well as the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process.

b. "To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack.

c. "To build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other executive branch, congressional, or independent bipartisan or nonpartisan commission investigations into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack."

23. Among other things, the Select Committee has been tasked with investigating "the facts, circumstances, and causes relating to the domestic terrorist

attack on the Capitol, including facts and circumstances relating to… influencing factors that contributed to the domestic terrorist attack on the Capitol and how technology, including online platforms, financing, and malign foreign influence operations and campaigns may have factored into the motivation, organization, and execution of the domestic terrorist attack on the Capitol, and other entities of the public and private sector as determined relevant by the Select Committee for such investigation."

24.      The Select Committee is also tasked with issuing a final report to the House containing its findings, conclusions, and recommendations for corrective measures to prevent future incidents similar to January 6, 2021. It, however, is forbidden to hold markups of legislation – the usual process by which legislation is developed in the House of Representatives.

### *Selection of the Select Committee's Membership & Purported Leadership Formation*

25.      H. Res. 503 requires Speaker Pelosi to appoint 13 members to the Select Committee and to consult with the minority leader about 5 of the 13 appointments. It also requires her to designate one Member to serve as chair of the Select Committee.

26.      As of this date, Speaker Pelosi has only appointed 9 members to the Select Committee. The Democrat members of the Select Committee are Rep. Susan Lofgren of California, Rep. Elaine Luria of Virginia, Rep. Adam Schiff of California, Rep. Peter Aguilar of California, Rep. Stephanie Murphy of Florida, and Rep. James Raskin of Maryland. The Republican members of the Select Committee are Rep. Elizabeth Cheney of Wyoming and Rep. Adam Kinzinger of Illinois. Speaker Pelosi has not made any efforts to comply with her obligation to appoint the remaining four members of the Select Committee.

27.     Speaker Pelosi designated Chairman Thompson to serve as the Chair of the Select Committee.

28.     Speaker Pelosi's actions both flout the requirements of H. Res. 503 and longstanding House practices. House Minority Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee as H. Res. 503: Rep. Jim Banks of Indiana, Rep. Rodney Davis of Illinois, Rep. Jim Jordan of Ohio, Rep. Kelly Armstrong of North Dakota, and Rep. Troy Nehls of Texas. He designated Rep. Banks as the Republican's Party's ranking minority member.

29.     Speaker Pelosi did not appoint any of Leader McCarthy's recommendations. In a public statement on July 21, 2021, she stated that objections had been raised about Representatives Banks and Jordan and the fact that their presence on the Select Committee may impact the "integrity of the investigation." Instead, she indicated a willingness to appoint Representatives Davis, Armstrong, and Nehls, and she asked him to recommend two additional members. She characterized her decision as "unprecedented."[1]

30.     Despite her public statement, Speaker Pelosi has never appointed Representatives Davis, Armstrong, and Nehls to the Select Committee. Instead, she unilaterally appointed Representatives Cheney and Kinzinger over Leader McCarthy's objections – something that H. Res. 503 never contemplated and that she herself has acknowledged is unprecedented.

---

[1] https://www.speaker.gov/newsroom/72121-2

31.     On September 2, 2021, Chairman Thompson announced that he appointed Defendant Cheney to serve as the Vice Chair of the Select Committee despite being unable to point to any authority that empowered him to do so.[2]

### Activities Of The Select Committee & Its Systematic Violation of House Rules

32.     Since its formation, the Select Committee has issued numerous subpoenas to compel deposition testimony and document production. These actions have systematically violated H. Res. 503 and the House of Representatives Rules.

33.     H. Res. 503, § 503 requires the Select Committee chair to confer with the ranking minority members prior to ordering the taking of depositions pursuant to a subpoena in a manner consistent with H. Res. 8, § 3(b)(1) of the 117th Congress, which establishes rules for the use of deposition authority. Those rules require the ranking minority to receive three days' notice before a deposition is taken as well as permit counsel designated by the ranking minority member to question the witness. *See* **Exhibit A.**

34.     The Select Committee has never had a ranking minority member. Each of the two political parties in Congress have rules and procedures governing how their ranking minority members are designated. For the Republican Party, those rules establish crystal clear procedures for appointing ranking members.[3] Rule 14(a) of the Republican Conference Rules of the 117th Congress provides that the Republican Steering

---

[2] https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair

[3] Rule 2(d)(2) of the Republican Conference Rules of the 117th Congress establishes the same rules for the appointment of the ranking Republican minority members as it does for committee chairs.

Committee must nominate ranking members who then must been approved by the full Republican House Conference. *See* **Exhibit B.**

35.     By rule and the customs, traditions, and precedents of the House, each party retains the right, in line with its own internal processes, to designate committee chairs and ranking members, and the other party cannot usurp that authority.

36.     The House Republican Steering Committee has never voted to appoint Defendant Cheney or Defendant Kinzinger to the position of minority ranking member on the Select Committee, and the House Republican Conference has never voted to approve such an appointment.

37.     Chairman Thompson has sought to circumvent House rules, customs, precedents, and traditions by appointing Defendant Cheney as Vice-Chair of the Select Committee despite having no authority to do so.

38.     A question exists as to whether Defendant Cheney is still a member of the Republican Party. The Wyoming Republican Party has expelled her as a member, and Chairman Thompson's act of appointing her to the position of Vice Chair confirms under House Rules that she is a member of the Democrat party because House Rule XI(2)(d) states that vice chairs are to be members of the majority party. *See* **Exhibit C**.

39.     The lack of a minority ranking member on the Select Committee since its existence renders it impossible for Chairman Thompson to confer with the minority ranking member before issuing deposition subpoenas, thus violating H. Res. 503 and house rules for the taking of depositions.

40.     Every deposition subpoena that Chairman Thompson has issued pursuant to H. Res. 503 is null and void because he has not conferred with a ranking minority member.

### The Select Committee Seeks To Uncover Information To Criminally Prosecute United States Citizens

41.     The Select Committee has no intention of preparing reports for the purposes of future legislation, nor does it have any authority to propose and report legislation to the full House of Representatives.

42.     The Select Committee and its members consider themselves and most of the other members of Congress victims of domestic terrorism. They also consider a small minority of Congressmen and Senators as well as Donald Trump to be domestic terrorists.

43.     The Select Committee and its members purport to be investigating "a domestic terrorist attack," and Select Committee members have littered the public record with comments indicating that they are primarily working to expose matters for the mere sake of exposing them and to secure individual determinations of guilt or innocence – an activity squarely within the providence of the Article II executive and the Article III judiciary:

      a.   In a series of public statements since the Select Committee's inception, Chairman Thompson and Defendant Cheney have articulated three purposes of its work: (1) to ensure "those responsible are held accountable," (2) to "tell[] the complete story of the unprecedented and extraordinary events of January 6th," and (3) to "get answers for the American people about what happened on January 6th." *The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States*

*Capitol*, 117th Cong. (2021) (Statement of Elizabeth Cheney, ViceChair); *Press Release, Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th* (Sept. 16, 2021); *Press Release, Thompson Statement on Cooperation of Witnesses* (Oct. 14, 2021).

b.  On November 10, 2021, Chairman Thompson made the following public comments about Select Committee efforts to obtain documents from President Trump's administration: "If we have access to the records, they'll speak for themselves. So we look forward, as a committee, to getting it. And we'll let the evidence based on what we look at determine guilt or innocence."[4]

c.  On December 1, 2021, Chairman Thompson made the following comments about witnesses subpoenaed by the Select Committee asserting their Fifth Amendment right to remain silent: "But you know, if you say you haven't done anything wrong, but on the other hand, you want to assert the Fifth Amendment in terms of self-prosecution, it says that you have something to hide. So we're going to give him an opportunity to do it. He can do it and it will be under oath and he is still subject to certain penalties should he decide to not tell us anything. If he

---

[4] https://www.yahoo.com/now/judge-denies-trump-effort-shield-023557589.html

is saying 'I'll come but I'll plead the Fifth,' in some instances that says you are part and parcel guilty to what occurred."[5]

44.     On December 13, 2021, Defendant Cheney publicly articulated the main focus of the Select Committee's "investigation" in the Select Committee's hearing on whether to hold former White House Chief of Staff Mark Meadows in contempt after he asserted various privileges that the Select Committee rejected: "Mr. Meadows' testimony will bear on a key question in front of this committee: Did Donald Trump, through action or inaction, corruptly seek to obstruct or impede Congress' official proceeding to count electoral votes?"

45.     Defendant Cheney's statement practically quotes from 18 U.S.C. § 1505, Clause 2, which criminalizes corrupt obstruction of Congress by force under the penalty of fines and, in the case of claimed domestic terrorism, up to 8 years of incarceration.

46.     On December 14, 2021, the House held Meadows in contempt for asserting legal claims of privilege.

47.     The Select Committee has not focused on President Trump alone. They have targeted other protestors for similar investigation and criminal referrals under 18 U.S.C. § 1505.

### *A Continuation Of Impeachment & A Well-Rehearsed Playbook*

48.     Since the House first impeached Donald Trump in December 2019 and failed in February 2020, House Democrats have repeatedly cast themselves as victims in a tragedy.

---

[5]
https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html

49.     As Defendant Schiff documents, they began to plan their revenge on Donald Trump and his political allies while still huddled in a Congressional safe room on January 6, 2021. *See* Adam B. Schiff, *Midnight in Washington*, p. 11 (2021). In doing so, they clearly contemplated criminal charges against Donald Trump and his allies regardless of whether they had a basis for them

50.     As the lead impeachment manager in Trump's first impeachment trial, Defendant Schiff completed a playbook on how to conduct Congressional prosecutions that he had been writing for decades.

51.     Schiff's playbook emphasizes a draconian use of Congress's coercive powers to bypass assertions of constitutional rights. The key features of it are:

   a.  Refuse to resolve assertions of privilege in court. Adam B. Schiff, *Midnight in Washington*, p. 230 (2021).

   b.  Create public crimes of obstruction for assertions of constitutional and common law privileges. *Id*. at p. 230.

   c.  Attach a presumption of guilt to assertions of constitutional and common law privileges. *Id*. at p. 230.

   d.  Demand information about virtually every part of a witness's life, including information that is constitutionally protected.

52.     Schiff's playbook also includes old-fashioned machinations as well, such as:

   a.  Issue last minute subpoenas to closed-door proceedings.

   b.  Force witnesses to testify in depositions without being fully prepared with the intention of creating perjury traps.

      c.  Leak selectively from closed door proceedings or quote selectively from evidence gathered so as to create public clamor for criminal or political prosecutions and destroy hostile witnesses' reputations.

53.    The Select Committee has adopted all of these tactics in its treatment of private citizens with the express goal of teeing them up for criminal prosecution.

### *The Select Committee Targets Alex Jones.*

54.    On November 22, 2021, Chairman Thompson issued a subpoena to Alex Jones ordering to produce documents to the Select Committee by December 6, 2021 and to testify at a deposition before the Select Committee on December 18, 2021. *See* **Exhibit D.** At the request of Jones' counsel, these initial dates have been postponed.

55.    As the factual basis for its subpoena, it cites statements made by Jones indicating that he assisted in organizing the January 6, 2021 protest held at the Ellipse in Washington, D.C., that President Trump's campaign asked him to led a march to a permitted protest area at the United States Capitol to hear President Trump speak, that he had assisted in securing funding for various permitted protests throughout Washington, D.C., and that the January 6th protests would be "wild." It also cites recordings in which Jones encouraged people at the Capitol to remain peaceful, act lawfully, and gather to hear President Trump's second speech.

56.    The Select Committee has requested countless documents that Jones possesses for various subjects including about his participation in legally permitted protests in Washington, D.C., financial transactions pertaining to those protests, and documents sufficient to determine how he promoted the protests. *See* **Exhibit D.**

57.    Through counsel, Jones has raised a number of constitutional objections to both the deposition subpoena and the document subpoena. However, Jones has offered

to submit documents and answer written questions with written responses. The Select Committee has refused to accept that offer and insists that he appear in person for a deposition in Washington, D.C. on January 10, 2022. Jones has notified the Select Committee that he intends to plead his right to remain silent under the Fifth Amendment. The Select Committee has suggested that it may turn to the courts to seek a grant of immunity for Jones and other witnesses.

58.     Jones further informed the Select Committee that he will raise First Amendment objections as appropriate when the Select Committee seeks to inquire as to journalistic activities as well as protected speech and political activity. Jones will also assert his Fifth Amendment rights to due process.

59.     With respect to his deposition subpoena, Jones has informed the Select Committee that he will assert his First, Fourth, and Fifth Amendment rights to decline to produce the documents requested by the Select Committee, asserting that he engaged in constitutionally protected political and journalistic activity under the First Amendment, that the Fourth Amendment guarantees him a right of privacy in his papers, and that he is entitled to due process and the right to remain silent under the Fifth Amendment.

60.     Counsel for the Select Committee has disputed Jones' assertion of these rights and whether Jones has any grounds for asserting any of these rights before the Select Committee on any questions whatsoever.

61.     On November 24, 2021, the Select Committee also issued a subpoena to AT&T for comprehensive information pertaining to Jones' telecommunications from November 1, 2020 to January 31, 2021 – the full copy of which Jones is unable to locate. *See* **Exhibit E**. Upon information and belief, the Select Committee has requested virtually

every phone call and text that Jones made for the requested time period and data associated with those phones calls and texts.

62.     Jones has good and substantial reason to fear that the Select Committee may cite him for contempt of Congress if he refuses to answer its questions on grounds of constitutional privilege.

63.     After extensive discussions between Jones' counsel and counsel for the Select Committee, the Select Committee offered Jones the opportunity to speak to its investigators informally about certain limited topics. Jones seriously considered this offer, but he ultimately rejected it for the following reasons:

    a.  The Select Committee has not treated others that it has offered the same
        deal to fairly and with respect.

    b.  The Select Committee's members have made it abundantly clear that
        they are only interested in prosecuting political adversaries.

### The Consequences of the House Holding Jones In Criminal Contempt.

64.     Under 2 U.S.C. § 192, a person who willfully fails to comply with a Congressional subpoena or refuses to answer questions faces the possibility of a misdemeanor conviction carrying a mandatory minimum of one month's incarceration and a maximum of 12 months' incarceration. People can also be fined up to $1,000.

65.     Both Houses of Congress have also exercised historically inherent contempt power to unilaterally arrest and imprison an individual found to be obstructing Congress' performance of its duties. *Jurney v. MacCracken*, 294 U.S. 125 (1935).

66.     Thus, Jones stands in an unconscionable position. If he exercises his constitutional rights, he could be criminally charged and imprisoned before this Court for merely claiming them without receiving a determination as to the extent to which he may

properly exercise them. Likewise, the House itself may choose to try him and imprison him for asserting his constitutional rights without ever affording him an independent and fair tribunal or an opportunity to obtain a judicial determination as to the assertion of his rights.

## COUNT ONE  – VIOLATION OF ARTICLE I, §§ 1, 8 OF THE U.S. CONSTITUTION

67.     Paragraphs 1 through 66 are incorporated herein.

68.     Authorized congressional committees have implied subpoena authority under Article I, §§ 1 and 8 of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135 (1927).

69.     Article III courts have jurisdiction over congressional actions that fail to observe its own rules. *See Yellin v. United States*, 374 U.S. 109, 114 (1963) (compiling cases). This jurisdiction takes on a special consideration when a person's rights are at stake.

70.     As pled previously, Speaker Pelosi has continuously failed to comply H. Res. 503 in assembling the Select Committee and, to this day, has not cured her failures. Her failures include:

    a.  Failing to appoint the requisite number of members (13) as mandated by H. Res. 503;

    b.  Failing to appoint the proper apportionment of members (8 Democrats and 5 Republicans) as mandated by H. Res. 503;

    c.  Purporting to appoint Defendant Cheney and Defendant Kinzinger as Republican members of the Select Committee over the House Republican Conference's objection and despite the fact that Defendant Cheney has been expelled from the Wyoming Republican Party;

d. Failing to appoint Reps. Davis, Armstrong, and Nehls to the Select Committee despite her promise to do so and House Minority Leader Kevin McCarthy's recommendation that she do so.

e. Declining to appoint Reps. Banks and Jordan to the Select Committee in violation of longstanding House traditions, precedents, rules, and customs despite House Minority Leader Kevin McCarthy's designation of Rep. Banks as the ranking minority member; and

f. Failing to confer with House Minority Leader Kevin McCarthy on the appointment of Republican members of the Committee.

71. As pled previously, Chairman Thompson and the Select Committee have continuously and repeatedly violated H. Res. 503 and other House rules by:

a. Operating without the appointment of all 13 members of the Committee as required by H. Res. 503;

b. Purporting to appoint Defendant Cheney as Vice Chair of the Select Committee to circumvent the House rules regarding the minority ranking member;

c. Issuing subpoenas, including to Alex Jones, without consulting with a minority ranking member as required by H. Res. 503 and House rules.

72. The Defendants have issued subpoenas to Alex Jones without complying with H. Res. 503 and House Rules under the form of a committee, which has not been constituted according to its authorizing resolution.

73. The Defendants now threaten to hold Alex Jones in criminal contempt of Congress for asserting his constitutional rights and legal objections to being compelled

to answer to an unlawfully constituted Congressional committee that has violated House Rules.

74.     The Defendants' conduct violates Article I, §§ 1, 8 of the United States Constitution.

### COUNT TWO – VIOLATION OF THE SEPARATION OF POWERS CONTAINED IN THE U.S. CONSTITUTION

75.     Paragraphs 1 through 74 are incorporated herein.

76.     The United States Constitution divides the powers of government into three branches of government: the legislature, the executive, and the judiciary.

77.     Congress does not have freewheeling power to investigate just for the sake of investigating or for purposes that belong exclusively to the executive branch. Instead, its investigative powers are inseparable from its legislative authority. *Trump v. Mazars USA, LLP*, 140 S.Ct. 2019 (2020). Thus, every subpoena that Congress or its committees issue must serve a valid legislative purpose.

78.     Determining if someone committed a crime and punishing what Congress perceives is a crime is not a valid legislative action. Instead, the law calls such activity a criminal prosecution and exclusively reserves that power to the Executive branch.

79.     Likewise, Congress cannot merely investigate a matter simply because it desires to expose the facts for the sake of exposure. *Watkins v. United States*, 354 U.S. 178, 200 (1957). In other words, everyone has natural curiosity, but Congress cannot satiate its members' curiosity and political desires simply by exposing information without looking to legislate.

80.     Additionally, even if Congress conducts an investigation to seek relevant information to legislate, it must still tailor a specific subpoena to serve a valid purpose.

*Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 2031 (2020). A subpoena may still be invalid if the contemplated legislation would be unconstitutional. *McGrain v. Daugherty*, 273 u.S. 135, 171 (1927).

81.     As pled above, the Defendants have repeatedly stated that their goal is to hold individuals accountable for the events of January 6, 2021, and they have made constitutionally baseless declarations of guilt and innocence simply because some targets of subpoenas have chosen to assert legal privileges and rights not to produce documents or testify. In other words, the Defendants have transformed themselves in a law enforcement tool with free license to circumvent the Bill of Rights.

82.     The Select Committee has not identified any legislative purpose served by the Jones subpoena or the AT&T subpoena. It has not considered any draft legislation, nor does H. Res. 503 permit it to engage in such a process. It has also not provided any explanation for why its requests to Jones would further any valid legislative end.

83.     H. Res. 503 has also presupposed that a crime has taken place, terming the events of January 6, 2021 a "domestic terrorist attack." The Select Committee now seeks to investigate it, not to draft new legislation, but to find out "who done it" and ensure that they are punished. That task is strictly the responsibility of the Executive Branch.

84.     None of the information sought by the Jones subpoena or the AT&T subpoena will even remotely inform a valid legislative purpose. Jones' activities pertaining to January 6, 2021 are protected by the First Amendment, which also provides a corresponding right to privacy in his activities to coordinate peaceful and lawful protests.

85.     Nothing that Jones can possibly provide the Select Committee will have any bearing on any contemplated constitutional legislation, and it is only relevant to the

Defendants' witch-hunt against political opponents and putative prosecutions under 18 U.S.C. § 1505 and other criminal statutes.

## <u>COUNT THREE – VIOLATION OF THE FIRST AMENDMENT</u>

86.    Paragraphs 1 through 85 are incorporated herein.

87.    The documents that the Defendants seek from Jones through the Jones subpoena fall into six broad categories and cover the time period December 19, 2020 to January 21, 2021:

   a.   First, they request all documents pertaining to political protests and demonstrations that Jones attended in the days preceding and after January 6, 2021.

   b.   Second, they ask Jones to identify all communication methods that he used that are related to the political protests and demonstrations that they have requested him to produce documents on.

   c.   Third, they have asked Jones to disclose all financial accounts pertaining to financial transactions, donations, speaking fees, and other fees that Jones received in connection with the political protests and demonstrations in the days preceding and after January 6, 2021. This includes the financial accounts for his business.

   d.   Fourth, they have asked Jones to produce all documentation regarding his trips to Washington D.C. on or about January 5-6, 2021, including his hotel accommodations and security.

   e.   Fifth, they have asked Jones to produce any documents that he has about fundraising for any of the protests and political demonstrations that he attend in the days preceding and after January 6, 2021.

f.  Sixth, they have identified a list of individuals, including President Trump, and asked Jones to produce any documents including communications that he has had with them about the events immediately preceding the protests in Washington D.C. against the certification of the election.

88.    In the AT&T subpoena, the Defendants also seek every phone call, text, voicemail, and other telecommunication that Jones made between November 1, 2020 and January 31, 2021 as well as all telecommunications data associated with those communications.

89.    Each of the categories of documents, telecommunications, and data requested by the Select Committee in its subpoena concern associational and expressive activities protected by the First Amendment, including the right to free speech, the right to petition the government for redress of grievances, and associational freedom. *See Buckley v. Valeo*, 424 U.S. 1, 64-66 (1976). Closely correlating to these expressive rights is the First Amendment right to privacy in group advocacy. *NAACP v. Alabama*, 357 U.S. 449 (1958).

90.    Both the Jones subpoena and the AT&T subpoena violate both Jones' expressive and associational rights under the First Amendment as well as his rights to privacy and group advocacy. The Defendants have no legitimate purpose for probing what they have requested from Jones, and no legislative action that they could possibly contemplate can constitutionally be based on Jones' activities. Their actions will irreparably chill constitutionally protected political expression in the United States if allowed to proceed.

91.     The Defendants also seek to probe activities that Jones conducted in his capacity as a journalist. While the First Amendment may permit the Executive Branch to compel a journalist's testimony and production before a grand jury, it does not permit a Congressional Committee on a witch-hunt for the sole purpose of exposing for the sake of exposing to breach First Amendment privacy. *Branzburg v. Hayes*, 408 U.S. 665, 699-700 (1972).

92.     In his capacity as a journalist, Jones possesses no information relevant to the carrying out of valid legislative purposes. He, however, retains a First Amendment right as a journalist to protect his sources and the information that he has gathered from congressional action that serves no legitimate legislative purpose.

93.     Thus, the Jones subpoena and the AT&T subpoena violate Jones' rights as a journalist under the First Amendment.

### COUNT FOUR  – VIOLATION OF THE FOURTH AMENDMENT

94.     Paragraphs 1 through 93 are incorporated herein.

95.     The Fourth Amendment protects a private individual's right to be free from unreasonable government searches and seizures as it pertains to their persons, houses, papers, and effects, and it protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

96.     The Fourth Amendment also prohibits the Defendants from issuing sweeping subpoenas untethered from valid legislative purposes. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946). All encompassing requests for personal, nonofficial documents exceed Congress's legitimate legislative power. *Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 2040 (2020). Additionally, the fact that a third party stores a

person's cell phone data does not alter his privacy expectation or its reasonableness. *Carpenter v. United States*, 138 S.Ct. 2206, 2217 (2018).

97.     Both the Jones subpoena and the AT&T subpoena seek communications and papers from Jones that are so broadly encompassing as to exceed the authorized purpose of the Select Committee. *McPhaul v. United States*, 364 U.S. 372, 381 (1960). Thus, even by congressional standards, the Jones subpoena is an unhinged fishing expedition designed to skirt the Fourth Amendment and obtain private documents and information that the United States could never get a search warrant for.

98.     Coerced compliance with the Jones subpoena would violate Jones' right to be free from unlawful searches and seizures, and AT&T's compliance with the AT&T subpoena would violate Jones' right to be free from unlawful searches and seizures as well.

**COUNT FIVE  – VIOLATION OF THE FIFTH AMENDMENT**

99.      Paragraphs 1 through 89 are incorporated herein.

100.    The right to remain silent under the Fifth Amendment is so well-established that it should be axiomatic even in Congressional proceedings.

101.    Jones has informed the Defendants that he intends to exercise his Fifth Amendment right to remain silent during his deposition, and they have informed his counsel that they do not believe that he can properly assert that right.

102.    The right to remain silent also encompasses broad document production requests contained in subpoenas that seek to discover sources of potentially incriminating evidence. *United States v. Hubbell*, 530 U.S. 27, 43-44 (2000).

103.    Jones has informed the Defendants that he will assert his Fifth Amendment right not produce documents in response to their broad requests because it would be akin

to telling inquisitors "the combination to a wall safe." *Id*. They have informed his counsel that they do not believe that he can properly assert that right.

104.    Rather than seek a determination from the Article III judiciary as to Jones claims stated within this claim, the Defendants have communicated a serious expression of intent to hold Jones in criminal contempt for refusing to comply with requests that are unlawful and unconstitutional. They have further intimated an intent to arrest, imprison, try, and punish him themselves, essentially appointing themselves judges to a dispute to which they are a party.

105.    Both with respect to Jones' assertion of his Fifth Amendment right to remain silent and his assertions of other objections including constitutional objections to responding to the Defendants' request, their intention to hold him in criminal contempt and possibly punish him themselves violates Jones' rights to due process under the Fifth Amendment, which guarantees him the bare minimum of fairness that is well-established at the common law: no man may be a judge in his own case.

## COUNT SIX  – VIOLATION OF THE STORED COMMUNICATIONS ACT (18 U.S.C. § 2702)

106.    Paragraphs 1 through 105 are incorporated herein.

107.    The Stored Communications Act provides that "a person or entity providing electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

108.    None of the exceptions enumerated in 18 U.S.C. § 2702(a)(1) apply.

109.    Jones has not given his consent to AT&T to produce the records requested by the AT&T subpoena.

110.    Congress has not amended 18 U.S.C. § 2702(a)(1) to create a specialized exception for itself or for the Select Committee.

111.    18 U.S.C. § 2702(a)(1) bars the Defendants from obtaining the communications requested in their AT&T subpoena.

112.    To the extent that the Defendants seek the production of non-communication records and information, 18 U.S.C. § 2702(c) prohibits such a disclosure, and no exception applies.

113.    Thus, AT&T's compliance with the subpoena and the Defendants' issuance of one violates 18 U.S.C. § 2702(c).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff seek declaratory and injunctive relief as follows:

A.  A declaratory judgment that the Select Committee is not a lawfully constituted committee and that its actions to date have been wholly without legal authority;

B.  A declaratory judgment that the Defendants have violated the Rules of the United States House of Representatives by issuing a deposition subpoena to Jones without Defendant Thompson first consulting with a duly appointed minority ranking member on the Select Committee;

C.  A declaratory judgment that the subpoena to Alex Jones and the subpoena to AT&T serve no valid legislative purposes and exceed the Select Committee's and Congress's constitutional authority in violation of the separation of powers principles contained in the United States Constitution;

D. A declaratory judgment that coerced compliance with the subpoena to Alex Jones and the subpoena to AT&T violate Alex Jones' First Amendment rights.

E. A declaratory judgment that coerced compliance with the subpoena to Alex Jones and the subpoena to AT&T violate Alex Jones' Fourth Amendment rights.

F. A declaratory judgment that coerced compliance with the subpoena to Alex Jones and the subpoena to AT&T violate Alex Jones' Fifth Amendment rights.

G. A declaratory judgment that the issuance of the AT&T subpoena and coerced compliance violates the Stored Communications Act (18 U.S.C. § 2702).

H. An injunction quashing the subpoena issued to Alex Jones and prohibiting its enforcement by the Defendants.

I. An injunction prohibiting the Defendants from imposing sanctions on Alex Jones for noncompliance with the subpoena issued to him.

J. An injunction quashing the subpoena issued to AT&T and prohibiting its enforcement by the Defendants.

K. An injunction prohibiting the Defendants from imposing sanctions on AT&T for noncompliance with the subpoena issued to it.

L. Reasonable costs and attorneys' fees; and

M. Any and all other relief that the Court deems just and proper.

The Plaintiff

/s/ Norman A. Pattis /s/
/s/ Cameron L. Atkinson /s/
NORMAN A. PATTIS, ESQ.
CAMERON L. ATKINSON, ESQ.[6]
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
Tel:  (203) 393-3017
Fax: (203) 393-9745
npattis@pattisandsmith.com
catkinson@pattisandsmith.com

---

[6] Mr. Atkinson has submitted an application for admission to the bar of this Court and meets all of the requirements for admission. He awaits admission pursuant to the rules of this Court.