# Exhibit D

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

To Alexander "Alex" Jones

You are hereby commanded to be and appear before the Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

[✓] **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: December 6, 2021          Time: 10:00 a.m.

[✓] **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: United States Capitol Building, Washington, DC 20515

Date: December 18, 2021          Time: 10:00 a.m.

[ ] **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____          Time _____

To any authorized staff member or the United States Marshals Service _____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at the city of Washington, D.C. this 22nd day of November, 2021.

_____
*Chairman or Authorized Member*

Attest: _____
*Clerk*

## PROOF OF SERVICE

Subpoena for
    Alexander "Alex" Jones

Address █████████████████████
█████████████

before the Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

---

Served by (print name) _____

Title _____

Manner of service _____

Date _____

Signature of Server _____

Address _____

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS

U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800



One Hundred Seventeenth Congress

Select Committee to Investigate the January 6th Attack on the United States Capitol

November 22, 2021

**VIA US MAIL**

Alexander "Alex" Jones



Dear Mr. Jones:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying schedule by December 6, 2021, and to appear for a deposition on December 18, 2021.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The investigation and public reports have revealed credible evidence of your involvement in the events within the scope of the Select Committee's inquiry. According to press reports and statements by you, you worked with Cindy Chafian and Caroline Wren to help organize the January 6, 2021, Women for America First ("WFAF") rally held on the Ellipse in Washington, D.C., including by facilitating a donor, now known to be Julie Fancelli, to provide what you characterized as "eighty percent" of the funding.[1] President Trump spoke at the rally shortly before the attack on the Capitol, urging the crowd to "fight much harder" and to "stop the steal." You were reportedly denied a speaking slot at the WFAF event but, at the request of President Trump, were offered a venue to, and did in fact, speak at the January 5, 2021, rally on Freedom Plaza sponsored by Ms. Chafian's Eighty Percent Coalition.[2]

---

[1] Documents on file with the Select Committee; Mike Spies & James Pearson, *Text Messages Show Top Trump Campaign Fundraiser's Key Role Planning the Rally that Preceded the Seige*, PRO PUBLICA (Jan. 30, 2021), https://www.propublica.org/article/trump-campaign-fundraiser-ellipse-rally; *The Alex Jones Show* (Jan. 7, 2021), https://www.banned.video/watch?id=5ff78ebd04bcc034cc085a73&list=5d81058ce2ea200013c01580 (starting at 9:18).

[2] Joshua Kaplan & Joaguin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, PRO PUBLICA (June 25, 2021), https://www.propublica.org/article/new-details-suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic.

Mr. Alexander Jones
Page 2

      Though you did not speak at the Ellipse rally, you were there. As you have stated, the White House told you on or about January 3, 2021, that after the Ellipse rally ended on January 6th, you were to lead a march to the Capitol, where President Trump would meet the group.[3] You did in fact march from the Ellipse rally to the Capitol, accompanied by Ali Alexander (also known as Ali Abdul Razaq Akbar) and others. When you arrived at the Capitol, you were recorded telling people not to be violent and to gather on the east side of the Capitol to hear President Trump speak.[4] That location coincided with a site for which Mr. Alexander's Stop the Steal had organized and obtained a permit for a rally that day, though using the name "One National Under God."[5] President Trump, however, did not leave the White House to come to the Capitol.

      In the lead-up to the events of January 6, you and others on Infowars repeatedly promoted President Trump's allegations of election fraud and urged people to come to Washington, D.C. for the January 6 Ellipse rally, and made statements implying that you had knowledge about the plans of President Trump with respect to the rally.[6] Indeed, after President Trump tweeted on Saturday, December 19, 2020, "Big protest in D.C. on January 6th. Be there, will be wild!,"[7] you went on

---

[3] *The Alex Jones Show* (Jan. 7, 2021), https://www.banned.video/watch?id=5ff78ebd04bcc034cc085a73&list=5d81058ce2ea200013c01580 (starting at 9:18).

[4] *See, e.g.*, Lena V. Groeger, et al., *What Parler Saw During the Attack on the Capitol* (Pro Publica, Jan. 17, 2021), https://projects.propublica.org/parler-capitol-videos/?id=5QCkdwJRD0a3 (marching down Pennsylvania Avenue at 1:10 p.m.); https://projects.propublica.org/parler-capitol-videos/?id=BQQyPL9LxpLz (telling crowd "Trump's on his way" and to "get to the other side of the Capitol" at 1:36 p.m.); https://projects.propublica.org/parler-capitol-videos/?id=BQQyPL9LxpLz (walking on Capitol grounds with Ali Alexander at 1:48 p.m.); https://projects.propublica.org/parler-capitol-videos/?id=Lap0L50xI3S5 (standing in front of Ali Alexander and telling crowd, "Go to the other side of the Capitol, that's where Trump's going to be" at 1:54 p.m.).

[5] Documents on file with the Select Committee; Ali Alexander, *Statement on Illegitimate Impeachment and January 6th*, https://stopthesteal.us/statement.

[6] *See e.g.*, The Alex Jones Show, *Deep State Panicked After Trump Calls on American People to March on D.C.* (Dec. 20, 2020) ("That's the biggest news of the day. He's calling on you now. He needs your help. We need your help. America needs to stand up. We need ten million people there on January 6th. . . . We're going to descend on the swamp January 6th. The President is going to be attending the rallies. He's announced he's going to be there. This is going to be mega massive"), https://banned.video/watch?id=5fe00281aff29e08ae9ac65a; The Alex Jones Show, *Will President Trump Speak at January 6th MAGA Rally in DC?* (Dec. 29, 2020) ("Now I know some incredible information that I am not at liberty to tell you. But I am at liberty to just give you a hint, which I don't think is too hard. You notice Trump said, 'January 6th will be wild in D.C.'? Well it will be wild. And I can tell you the Twilight Zone nature of all of this went up to a whole new level yesterday. And I'll just leave it at that. . . . Well let's just say you're going to want to go to D.C. on the 6th. It will show the globalists we know Trump really won. And it will begin the process one way or another of removing the globalist puppet Joe Biden. And I mean by impeachment or keeping him from getting in on the 20th"), https://banned.video/watch?id=5feb6faea981ab18e1a3d2b4; The Alex Jones Show, *BREAKING: President Trump Will Officially Speak At MAGA March In DC On January 6th* (Dec. 30, 2020) ("Alright folks, we've got some big, breaking, exclusive news here for you that I am now authorized to tell you. . . . This one's going to be the big one to repudiate the whole system. . . . The President has not decided exactly when he's going to speak, but it's going to be him with his supports on the 6th, probably at about 12:30 right before all the big debates in the Senate kickoff at 1:00 p.m. Eastern"), https://banned.video/watch?id=5fecef489e16791e714c5aa8; Just Another Channel, *January 6th, 2021, Washington, D.C. [TRAILER]* (Dec. 30, 2020), https://banned.video/watch?id=5fec6ee4795db01df74c9ef5; War Room with Owen Shroyer, *President Trump to Provide Specific Evidence of Voter Fraud on January 6th* (Dec. 30, 2020), https://banned.video/watch?id=5fed2ab82d1c001f1e62ac4e; Sunday Night Live, *President Trump and America Fight for It's [sic] Life on Jan 6th* (Jan. 3, 2021), https://banned.video/watch?id=5ff2905c0fe045288c6acd43;

[7] Trump, Donald J. [@realDonaldTrump]. "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory for Trump [link omitted]. A great report by Peter. Statistically impossible to have lost

Mr. Alexander Jones
Page 3

Infowars that same day and called the tweet "One of the most historic events in American history[.]"[8] You continued:

> But finally Trump has done the right thing. . . . He is now calling on We the People to take action and to show our numbers. . . . This is the most important call to action on domestic soil since Paul Revere and his ride in 1776. The time for games is over. The time for action is now. Where were you when history called? Where were you when you and your children's destiny and future was [sic] on the line? I've been on the air 27 years, and I've never reported on anything that comes as close to being this huge. This is seismic.
>
> . . .
>
> And if you allow this multinational consortium to steal our election, you have committed not just us, but yourselves, to a living hell. . . . Trump is trying to do a lot of good things. And he is our President and he was reelected.
>
> . . .
>
> If you feel like you're being robbed, and you've seen the evidence of that, and you're upset, and you have that bad sinking feeling we've all got, then stand up and speak out and promote this massive event coming up in D.C. on January 6th. Where a sitting U.S. President, for the first time in my lifetime, is calling on Americans to march on D.C. to save our country from a foreign takeover. This is so real. This is so epic. This is so historic. This is so incredibly dangerous if we don't take action. I know you will. And I know we're going to see ten million people in Washington, D.C. on January 6th. And I'm going to be there.
>
> Now if you choose to accept this mission, take this video at banned.video and share it with everyone you know. Because if you don't take action, we'll be defeated. If you do take action, we will win. God bless and good luck.[9]

On December 31, 2020, Matt Bracken stood in for you as a guest host on the Alex Jones Show.[10] Mr. Bracken stated during the broadcast, while images of QAnon-related tattoos were displayed (two with the acronym WWG1WGA, meaning "Where we go one, we go all"):

> We're not going to be saved by anybody above us. We're going to only be saved by millions of Americans moving to Washington, occupying the entire area, if necessary storming right into the Capitol. We know the rules of engagement. If you have enough people, you can push down any kind of a fence or a wall. But if

---

the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Twitter, (December 19, 2020), https://www.thetrumparchive.com/.

[8] The Alex Jones Show, *Trump Declares National Emergency! Calls For Americans To March Against The Swamp January 6, 2021* (Dec. 19, 2020), https://www.banned.video/watch?id=5fde8270a8d3d905041c357a.

[9] *Id.* Comments left by people visiting the site for the episode included the following two: 1) "I am Not going unless we go armed to the teeth. Protesting and waving flags does Nothing. We need to show them that we mean business. With Fear comes Respect. Go unarmed to an antigun liberal city where the crooked dc police do not protect the citizens from harm? Good luck with that." 2) "Alex, you know it's not possible through a peaceful way. I don't say we have to burn down Washington but if nothing happens people definitely need to raid the congress." https://www.banned.video/watch?id=5fde8270a8d3d905041c357a.

[10] The Alex Jones Show, *January 6th Will Be a Turning Point in American History* (Dec. 31, 2020), https://banned.video/watch?id=5fee715284a7b6210e12a2f7.

Mr. Alexander Jones
Page 4

> not enough patriots show up, then we're just going to watch our freedom go down the drain.[11]

Accordingly, the Select Committee seeks documents and a deposition regarding these and other matters that are within the scope of the Select Committee's inquiry. A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at ▮▮▮▮▮▮▮▮ to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[11] *Id.*

Mr. Alexander Jones
Page 5

## SCHEDULE

In accordance with the attached definitions and instructions, you, Alexander "Alex" Jones, are hereby required to produce, all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)—referring or relating to the following items.

1. For the time period December 19, 2020, to January 31, 2021, all documents and communications concerning the rally the Eighty Percent Coalition held in Freedom Plaza in Washington, D.C. on January 5, 2021, at which you and others spoke (the "January 5 Freedom Plaza Rally").

2. For the time period December 19, 2020, to January 31, 2021, all documents and communications concerning the rally Women for America First held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke (the "Ellipse Rally").

3. For the time period December 19, 2020, to January 31, 2021, all documents and communications concerning the rally for which Ali Alexander (also known as Ali Abdul Razaq Akbar) and others, under the name of a purported organization called "One Nation Under God," obtained a permit from the U.S. Capitol Police to hold a rally at Lot 8 on the U.S. Capitol Grounds in Washington, D.C. on January 6, 2021, (the "U.S. Capitol Rally").

4. For the time period January 6, 2021, to January 31, 2021, all documents and communications concerning the facts and circumstances of the attack on the U.S. Capitol in Washington, D.C. that occurred on January 6, 2021 (the "U.S. Capitol Attack").

5. For the time period December 19, 2020, to January 31, 2021, documents sufficient to identify all email accounts, social media accounts, messaging services, or websites you used, whether directly or indirectly, to market, advertise, or promote, or otherwise communicate about, the January 5 Freedom Plaza Rally, the Ellipse Rally, or the U.S. Capitol Rally (collectively, the "Rallies").

6. For the time period December 19, 2020, to January 31, 2021, documents sufficient to identify all telephone numbers you used to communicate about the any of the Rallies.

7. For the time period November 1, 2020, to January 31, 2021, documents sufficient to identify all financial accounts ("Financial Accounts") for which you were the direct or indirect beneficial owner, or over which you exercised control, including but not limited to Financial Accounts held in the name of Free Speech Systems LLC and:

    a. Into which funds were transferred or deposited to compensate or reimburse you for your work in connection with any of the Rallies;

Mr. Alexander Jones
Page 6

       b. From which funds were transferred or withdrawn for any purpose in connection with any of the Rallies; or

       c. Into which funds were transferred or deposited as a donation or otherwise to support you in connection with any of the Rallies, to include but not limited to the account into which Julie Fancelli paid Free Speech Systems LLC, $200,000.

8. For each Financial Account identified in response to Request 7 above, documents sufficient to identify all account transactions for the time period November 1, 2020, to January 31, 2021, in connection with any of the Rallies.

9. All communications sent or received by you on January 5 or 6, 2021, relating to efforts to challenge the legitimacy of, interfere with, or disrupt the 2020 presidential election; efforts to interfere in government processes; or events in Washington, D.C. on January 5 and 6, 2021.

10. For the time period December 19, 2020, to January 31, 2021, all documents and communications concerning security for you while you were in Washington, D.C. from on or about January 5 to 6, 2021.

11. For the time period December 19, 2020, to January 31, 2021, all documents and communications concerning funding for your trip to Washington, D.C. from on or about January 5 to 6, 2021, to include but not limited to your hotel accommodations and security.

12. For the time period December 19, 2020, to January 31, 2021, all documents and communications concerning funding Roger Stone's trip to Washington, D.C. from on or about January 5 to 6, 2021, to include but not limited to his hotel accommodations and security.

13. For the time period December 19, 2020, to January 31, 2021, all documents and communications concerning fundraising for any of the Rallies.

14. For the time period December 19, 2020, to January 31, 2021, all documents and communications related to any plan for you, Roger Stone, or President Trump to go to the U.S. Capitol on January 6, 2021. This request includes any such documents or communications related to a decision not to march or walk to the U.S. Capitol on January 6, 2021.

15. For the time period December 19, 2020, to January 31, 2021, all communications with Ali Alexander (also known as Ali Abdul Razaq Akbar) concerning any of the Rallies, or any of the facts and circumstances of the topics that are the subject of any of the above requests.

16. For the time period December 19, 2020, to January 31, 2021, all communications with Owen Shroyer concerning any of the Rallies, or any of the facts and circumstances of the topics that are the subject of any of the above requests.

Mr. Alexander Jones
Page 7

17. For the time period December 19, 2020, to January 31, 2021, all communications with Roger Stone concerning any of the Rallies, or any of the facts and circumstances of the topics that are the subject of any of the above requests.

18. For the time period December 19, 2020, to January 20, 2021, all communications with any member of the Proud Boys, Oath Keepers, or Three Percenters concerning any of the Rallies, or any of the facts and circumstances of the topics that are the subject of any of the above requests.

19. For the time period December 19, 2020, to January 31, 2021, all communications with President Trump, his family members, advisors, lawyers, or White House staff concerning the 2020 Presidential election, any of the Rallies, or any of the facts and circumstances of the topics that are the subject of any of the above requests.

20. For the time period December 19, 2020, to January 31, 2021, all communications with Members or Members-elect of Congress, their advisors, campaign staffs, or Congressional staffs concerning the 2020 Presidential election, any of the Rallies, or any of the facts and circumstances of the topics that are the subject of any of the above requests.

21. To the extent not covered by the above requests, for the time period January 6, 2021, to present, all documents and communications whenever dated provided to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the topics that are the subject of any of the above requests.

22. For the time period January 6, 2021, to present, all correspondence or communications whenever dated from or to any law enforcement agency, including but not limited to the U.S. Department of Justice and the Federal Bureau of Investigation, concerning the facts and circumstances of the topics that are the subject of any of the above requests.

## **DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS**

1. In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2. Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee').

3. In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4. The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5. Electronic document productions should be prepared according to the following standards:

   a. If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   b. All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6. Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7. Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8. When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9. The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4. The term "including" shall be construed broadly to mean "including, but not limited to."

5. The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6. The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7. The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8. The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9. The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

# H. Res. 8

*In the House of Representatives, U. S.,*

*January 4, 2021.*

*Resolved,*

**SECTION 1. ADOPTION OF THE RULES OF THE ONE HUNDRED SIXTEENTH CONGRESS.**

The Rules of the House of Representatives of the One Hundred Sixteenth Congress, including applicable provisions of law or concurrent resolution that constituted rules of the House at the end of the One Hundred Sixteenth Congress, are adopted as the Rules of the House of Representatives of the One Hundred Seventeenth Congress, with amendments to the standing rules as provided in section 2, and with other orders as provided in this resolution.

**SEC. 2. CHANGES TO THE STANDING RULES.**

    (a) CONFORMING CHANGE.—In clause 2(i) of rule II—

        (1) strike the designation of subparagraph (1); and

        (2) strike subparagraph (2).

    (b) OFFICE OF DIVERSITY AND INCLUSION AND OFFICE OF THE WHISTLEBLOWER OMBUDS.—

16

**SEC. 3. SEPARATE ORDERS.**

(a) MEMBER DAY HEARING REQUIREMENT.—During the first session of the One Hundred Seventeenth Congress, each standing committee (other than the Committee on Ethics) or each subcommittee thereof (other than a subcommittee on oversight) shall hold a hearing at which it receives testimony from Members, Delegates, and the Resident Commissioner on proposed legislation within its jurisdiction, except that the Committee on Rules may hold such hearing during the second session of the One Hundred Seventeenth Congress.

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

(c) WAR POWERS RESOLUTION.—During the One Hundred Seventeenth Congress, a motion to discharge a measure introduced pursuant to section 6 or section 7 of the War